IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
───────────────────────────────────────────────────────

THE HOMESTEADER'S STORE, INC.,

                Plaintiff,              AMENDED OPINION and
v.                                       ORDER

KUBOTA TRACTOR CORPORATION,            24-cv-23-jdp

                Defendant.
───────────────────────────────────────────────────────

The Homesteader's Store, Inc. sells light-duty yard and farm equipment from two stores, one in Madison and another in Richland Center. Among the brands it carries is Kubota Tractors. Homesteader's Kubota sales have been lagging, and Kubota Tractor Corporation wants to terminate the dealership. Homesteader's filed this case under the Wisconsin Fair Dealership Law to prevent the termination.

Now before the court is Homesteader's motion for preliminary injunction. Based on the parties' written submissions and the evidence presented at a hearing on the motion, the court concludes that Homesteader's is entitled to a preliminary injunction. But the court will ask the parties for briefing on the proper bond to secure the injunction.

BACKGROUND FACTS

The court finds the following facts from the materials submitted and the evidence presented at the hearing on April 2, 2024. Some additional facts are set out where relevant in the analysis section.

**A. The parties and their dealer agreement**

Homesteader's is a local recreational land equipment business that sells tractors, rideable mowers, and snow removal equipment. Its typical customers have either relatively large residential property or relatively small hobby farms. Rick DeYoung, Homesteader's owner, opened the first retail location in Richland Center, Wisconsin, in 2007. In 2011, Homesteader's opened its second in Madison, Wisconsin.

Kubota Tractor Corporation manufactures and distributes a broad range of machinery and equipment, including tractors, hay tools, compact construction equipment, consumer lawn and garden equipment, commercial turf products, and utility vehicles. Homesteader's has been an authorized dealer for Kubota since it opened its first store. The Dealer Sales and Service Agreement is non-exclusive for both parties: Homesteader's can sell other brands, and Kubota has other dealers that may serve the same geographic market. Homesteader's is authorized to sell only a subset of Kubota's products, specifically tractors under 120 horsepower.

The dealer agreement sets out Homesteader's obligations, which include advertising requirements, standards for maintaining its facilities, personnel, and inventory, and sales goals. *See* Dkt. 25-1, at 16. Kubota's basis for termination is primarily Homesteader's failure to meet sales goals. Kubota assigns each of its dealers a local market area (LMA) consisting of one or more counties. Kubota measures a dealer's performance based on its market share within its LMA. A Kubota dealer meets its sales goal if it is at or above the average market share for dealers in the state. Some counties are included in more than one dealer's LMA. In those cases, the dealers who share that county will each be assigned a percentage of responsibility for the county. So, for example, if a county is served by two dealers, each might be assigned 50 percent responsibility for that county. So the dealers in that county would meet their sales goal if they

2

had 50 percent of the state average market share. Notably for this case, sales made to customers outside the dealer's LMA are not counted toward the LMA market share.

The LMA for each of Homesteader's locations was set at least as far back as 2016, when the parties executed the current version of Homesteader's dealer agreement. As shown in the map below, the Richland Center Store's LMA comprises Vernon, Crawford, Richland, and Grant counties and the Madison Store's LMA comprises Dane and Columbia counties:



Both stores share responsibility for counties within their LMA with other nearby stores. The following chart shows the division of responsibility for each of the counties within Homesteader's LMAs:

| LMA | County | Kubota Dealer | Responsibility |
|---|---|---|---|
| Madison | Columbia | McFarlane MFG Co., Inc. | 34% |
| | | Powersports Company, LLC | 33% |
| | | The Homesteader's Store, Inc. | 33% |
| | Dane | McFarlane MFG Co., Inc. | 25% |
| | | Ritchie Implement, Inc. | 25% |
| | | The Homesteader's Store, Inc. | 50% |

3

| | | | |
|---|---|---|---|
| Richland Center | Crawford | Portland Implement, Inc. | 50% |
| | | The Homesteader's Store, Inc. | 50% |
| | Grant | Ritchie Implement, Inc. | 75% |
| | | The Homesteader's Store, Inc. | 25% |
| | Richland | The Homesteader's Store, Inc. | 100% |
| | Vernon | Portland Implement, Inc. | 75% |
| | | The Homesteader's Store, Inc. | 25% |

**B.  Notice of termination**

Homesteader's began having problems meeting the average Wisconsin market share in 2020. Homesteader's attributes its initial problems to Dane County's COVID-19 restrictions on in-person activities. Homesteader's temporarily stopped ordering Kubota tractors in late 2020 and early 2021. The suspension of Kubota orders affected Homesteader's allocations for certain Kubota products. So Homesteader's began selling another brand of tractor, LS, because it was concerned that it would not get future allocations of Kubota tractors.

In April 2021, Kubota sent a formal "call to action" letter notifying Homesteader's that it was below the average Wisconsin market share from 2016 through 2020 for at least its Richland Center location and needed to improve its market share. Dkt. 36-1. In September 2021, Kubota sent an additional call to action letter, which said that although Homesteader's had increased sales, it continued to rank below the average state market share. Dkt. 36-2. Kubota representatives suggested to DeYoung that Homesteader's should terminate its dealership agreement because it was not going to be able to improve its market share. Dkt. 36-3. In April 2023, Kubota sent another call to action letter saying that Homesteader's continued to have a steady decline in market share in 2022. Dkt. 36-4.

Kubota gave notice of termination on August 10, 2023, giving Homesteader's 120 days (until December 8, 2023) to cure the defaults identified in the notice. Dkt. 36-5. If Homesteader's failed to cure within the cure period, the termination would be effective January 22, 2024. The termination notice cited failure to meet sales goals, failure to meet the facility standard for appearance of its stores, and failure to comply with Kubota's advertising requirements. DeYoung emailed Kubota complaining that "it will be basically impossible for us to meet state marketshare numbers by the 8th of December" because Kubota was not providing the inventory Homesteader's needed to improve its market share. Dkt. 25-3, at 2. Homesteader's cured the defaults concerning the facility standard and advertising, but it did not meet the average Wisconsin market share. After the cure period expired, Kubota informed Homesteader's that it planned to move forward with termination.

In January 2024, Homesteader's filed a complaint and motion for a temporary restraining order in the Dane County Circuit Court to stop Kubota from terminating the dealer agreement. Kubota removed the case to this court.

ANALYSIS

To obtain a preliminary injunction, Homesteader's must make an initial showing of three things: (1) that it has some likelihood of success on the merits; (2) that it has no adequate remedy at law; and (3) that without relief it will suffer irreparable harm. *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019). If Homesteader's meets these requirements, the court balances "the irreparable harm that [Homesteader's] would endure without the protection of the preliminary injunction against any irreparable harm [Kubota] would suffer if the court were to grant the requested relief." *Valencia v. City of Springfield, Illinois*,

5

883 F.3d 959, 966 (7th Cir. 2018) (citation omitted). The Seventh Circuit applies a sliding scale for the balancing phase. *GEFT Outdoors*, 922 F.3d at 364. "[I]f a plaintiff is more likely to win, the balance of harms can weigh less heavily in its favor, but the less likely a plaintiff is to win the more that balance would need to weigh in its favor." *Id.* When balancing the harms to the parties, the court must also consider whether an injunction is in the public interest. *Id.*

## A. Likelihood of success on the merits

The parties agree that Wisconsin Fair Dealership Law applies here. Under the WFDL, Kubota cannot terminate the agreement without good cause and it must provide adequate notice that identifies the dealer's default and gives the dealer an opportunity to cure it. Wis. Stat. §§ 135.03, 135.04. Ultimately, Kubota will bear the burden of proving that it has good cause to terminate Homesteader's dealer agreement. Wis. Stat. § 135.03. But at this stage, Homesteader's has the burden of showing that it has "some likelihood of success on the merits" of its claim under the WFDL. *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020) (citation omitted). The requirement for "some likelihood of success on the merits" is not a bright-line test. The Seventh Circuit has explained that "a mere possibility of success is not enough," but a party seeking a preliminary injunction is not required to prove its likelihood of success by a preponderance of the evidence. *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 762–63 (7th Cir. 2020). The Seventh Circuit has said that "[w]hat amounts to 'some' depends on the facts of the case at hand because of our sliding scale approach." *Mays*, 974 F.3d at 822.

Homesteader's contends that Kubota violated the WFDL in three ways. First, Kubota made it impossible for Homesteader's to meet the average state market share during the cure period because Kubota did not provide adequate inventory for Homesteader's to meet customer needs. Second, Kubota applied the market share metric in a discriminatory manner

6

when it sent a notice of termination to Homesteader's but not to other underperforming dealers. Third, Kubota's LMA market share performance metric is not an essential and reasonable requirement of the dealership agreement.

The first two theories don't require much discussion. A notice of termination can be inadequate if the grantor makes the cure period so short that it would be impossible for the dealer to rectify its default. *Al Bishop Agency, Inc. v. Lithonia-Div. of Nat. Serv. Indus., Inc.*, 474 F. Supp. 828, 835 (E.D. Wis. 1979). But Homesteader's evidence about its inventory was meager and conclusory. If Homesteader's had sold all of the tractors it had in inventory, it would have cured its default. Homesteader's contends that it didn't have loaders matched to the tractors on hand, which meant that it couldn't sell the tractors. But Homesteader's didn't provide the data that would substantiate such a claim by the time of the hearing. As for Homesteader's contention that Kubota treated Homesteader's worse than similarly struggling dealers, Kubota showed that Homesteader's was the only dealer consistently at the bottom of its market share ranking.

Homesteader's third theory has more traction. Homesteader's makes a good case that Kubota's LMA market share metric is not a reasonable and necessary dealership requirement. A proper sales quota can be a reasonable and necessary requirement for maintaining a dealership. *Al Bishop Agency*, 474 F. Supp. at 834. And there's no dispute that Homesteader's Kubota sales are diminishing. But Kubota's LMA market share approach has three serious problems. First, the LMAs are comprised only of whole counties. The reason for this, according to Kubota, is that market data from the Association of Equipment Manufactures is compiled by county, so it's convenient to draw LMAs to line up with the AEM county data. But real-world markets don't match county lines. Northern Green County is much closer the

7

Homesteader's Madison store than any part of Columbia County. But Green County is not in Homesteader's LMA, and any sales to Green County customers don't count toward Homesteader's LMA market share.

Second, Kubota could not explain how the percent of responsibility for shared counties was established. Kubota's former head of the Midwest division for Kubota Tractor Corporation, Michael Jacobson, testified that many factors went into setting the percentage, including historical sales data, the physical location of dealers' stores, rough populations and city centers, and geographic features such as interstates and highways. But those factors were described only in generalities. There was no explanation of how they were applied to Homesteader's LMA. And those percentages were established at least eight years ago, so apparently no one at Kubota could explain how they were derived for Homesteader's. And its not at all clear that whatever historical factors went into Homesteader's percentages still apply.

The evidence suggests good reasons to be skeptical of the percentages. The percentages in Homesteader's LMA are all round numbers—the counties are split up by quarters and thirds. That suggests only ballpark estimates, not any real analysis of the complex factors invoked by Jacobson. Homesteader's is assigned 50 percent responsibility for Dane County. But right on the border of Dane County is McFarlanes' in Sauk City, a large farm implement dealer with a 100-year history. McFarlanes' is assigned only 25 percent responsibility for Dane County, but it seems likely that given its prominence in the area, it could easily capture more of the Dane County market than Homesteader's.

Third, Kubota gives dealers credit for only those sales made within a store's LMA. Kubota contends that this is because Kubota "wants its dealers to be the local dealer of choice for sales and services within that dealer's geographic area." Dkt. 31, at 6. That's a plausible

8

reason, but Homesteader's showed that doesn't reflect the conditions of the market for its Madison store. DeYoung testified that customers of the Madison store commonly buy tractors for vacation property outside of Dane County, which means that Homesteader's will not get market share credit for a significant portion of its sales. Although the court is not persuaded that Kubota applies its LMA market share requirement in a discriminatory way, the formula itself disadvantages dealers like Homesteader's that have urban customers buying tractors for vacation homes.

At the level of the individual dealer, sales of even a dozen tractors would make a significant difference in the LMA market share. The border of the LMA and the percentage of responsibility assigned to the dealer would have an even greater effect on the LMA market share, and thus whether the dealer meets requirements of the dealership agreement. Homesteader's has shown that it has a likelihood of success on the merits by showing that LMA market share does not reflect a reasonable and necessary sales quota, but rather an arbitrary one, open to arbitrary enforcement. The court concludes that Homesteader's has shown a sufficient likelihood of success on the merits of its WFDL claim.

**B. Irreparable harm and no adequate remedy at law**

Any violation of the WFDL "is deemed an irreparable injury to the dealer for determining if a temporary injunction should be issued." Wis. Stat. § 135.065. Kubota contends that the statute's presumption of irreparable harm is rebutted in this case because it can quantify lost revenues. But Homesteader's has provided evidence that shows it would be irreparably harmed if Kubota is allowed to terminate the dealer agreement while its lawsuit is pending. DeYoung testified that, in 2023, 50 percent of Homesteader's income was derived from Kubota products. This appears to be consistent with the revenues from sales and service

9

of Kubota products shown on Homesteader's profit and loss report. Dkt. 31-1. DeYoung estimates that if Kubota terminated Homesteader's dealership now, Homesteader's would have major cash flow problems and likely go under by the end of the summer. DeYoung also testified that Homesteader's is paying its attorneys in this case hourly, not on a contingency basis, and that it could not fund this litigation if Kubota terminated its agreement. Going out of business during the pendency of the lawsuit and being unable to continue funding the lawsuit are both irreversible harms that cannot be adequately addressed by monetary damages at the end of trial. *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) (explaining that two reasons a damages remedy could be inadequate are if it would "come too late to save the plaintiff's business" and if it the plaintiff would "not be able to finance his lawsuit against the defendant without the revenues from his business that the defendant is threatening to destroy"). The court concludes that Homesteader's has shown that it will suffer irreparable harm without a preliminary injunction.

As for whether Homesteader's has an adequate remedy at law, Kubota contends that monetary damages can adequately compensate Homesteader's for the loss of Kubota's business. That might be true over the course of this litigation, using projections based on historical sales data. But projections of lost revenue and profit over the life of the Kubota dealership would likely be too speculative to support an award of compensatory damages. And a damages award at the end of litigation is an inadequate remedy if Homesteader's goes out of business while the case is pending. The court concludes that Homesteader's has shown that it has no adequate remedy at law.

**C. Balancing of the interests**

Homesteader's has made the threshold showing necessary for the court to weigh the irreparable harm that Homesteader's faces without an injunction against any irreparable harm Kubota would face if the court issued a preliminary injunction. The court has already determined that Homesteader's would face very substantial harm from the termination of the dealership. Kubota contends that it will face both quantifiable and unquantifiable harms if it is not allowed to terminate the agreement.

As for the quantifiable harm, Kubota asserts that it will lose the profits that it would earn by replacing Homesteader's with a full-line dealer that meets the average state market share goal. At the hearing, Kubota presented a calculation that lost profits for a two-year period (which it assumed was the projected duration of the litigation) would be more than $1.3 million.[1] But there are two obvious flaws in Kubota's calculations. First, Kubota assumes that a replacement dealer would sell at the average state market share without drawing sales from existing Kubota dealers. Sales drawn from other dealers would produce no additional revenue or profit to Kubota. McFarlanes' is on the border between Sauk and Dane Counties and sells the full line of Kubota products. Kubota has another dealer in Madison that sells Kubota construction equipment. Kubota provided no evidence to support the assumption that the replacement dealer would reach its market share without drawing sales from McFarlanes' or

---

[1] The calculation that Kubota presented at the hearing is significantly lower than the estimate of $1.2 million per year of lost profits it presented in its brief. *See* Dkt. 31, at 49. Kubota did not explain this discrepancy at the hearing. The higher estimate in Kubota's brief is based on the declaration of Michael Horrell, the district sales manager for Kubota's Midwest division. But Horrell's declaration did not provide any of the underlying calculation that he used to reach his estimate, *see* Dkt. 36, ¶ 13, so the court will assess Kubota's potential harm based on the lower estimate it provided at the hearing.

the Madison construction equipment dealer. (The court notes that Homesteader's is not authorized to sell Kubota construction equipment, so that is a questionable component of the analysis.) Second, Kubota did not account for any ramp-up period for a replacement dealer. Kubota does not have a replacement dealer lined up. So even if Kubota entered an agreement with a new dealer as soon as it could after terminating Homesteader's dealer agreement, it would take time to get a new dealer up and running with a customer base. It is not realistic to assume that a replacement dealer would be selling Kubota products at the averages state market share in the two-year period immediately following Homesteader's termination. Kubota's presentation of its quantifiable harms is so fundamentally flawed that it is incredible. Kubota has multiple dealers serving each of the counties in Homesteader's market areas, which strongly mitigates any potential loss of sales from Homesteader's failings.

As for the unquantifiable harms, Kubota contends (1) that its reputation will suffer from Homesteader's poor representation of its brand, and (2) that it would lose credibility with its other dealers if they don't enforce their sales requirements. The court finds these alleged harms to be mostly speculation. But Kubota did present evidence that Homesteader's is understaffed and not currently certified for Kubota service. The court accepts that Homesteader's service deficiencies could cause reputational damage to Kubota. But this potential comes nowhere close to outweighing the harm to Homesteader's, which includes going out of business before the conclusion of the litigation.

The court must also consider the public interest. The court concludes that the public does not have a strong interest one way or the other. The WFDL demonstrates the state's interest in protecting dealers from abuse by manufacturers. But the WFDL does not grant

tenure to underperforming dealerships. Whatever interest the public has in this case is reflected in the balance built into the WFDL itself.

The balance of the harms tips strongly in favor of Homesteader's, and Homesteader's has made adequate showing of likelihood of success. The court makes no decision here on the ultimate merits of case, but it concludes that Homesteader's has established its entitlement to an injunction.

**D. Bond**

Absent certain circumstances not present in this case, the court must require a litigant seeking a preliminary injunction to post "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined" before issuing an injunction. Fed. R. Civ. Pro. 65(c). Kubota asks the court to impose a bond of $2.4 million based on its projected losses from not being able to replace Homesteader's with a dealer that will meet the average Wisconsin market share. *See* Dkt. 31, at 49. Kubota contends that this is consistent with the Seventh Circuit's direction that "when setting the amount of security, district courts should err on the high side." *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 456 (7th Cir. 2010) (quoting *Mead Johnson & Co. v. Abbott Laboratories*, 201 F.3d 883, 888 (7th Cir. 2000)). But this request is based on an estimated annual lost profits of $1.2 million that is nearly double the annual amount shown in the lost profits calculation it presented at the hearing.

For reasons explained above, the court does not find Kubota's projected losses credible. Homesteader's did not address the issue of bond either in its brief or at the hearing. The court will give the parties until April 26, 2024, to submit proposals, with supporting argument, regarding the appropriate amount for an injunction bond.

ORDER

IT IS ORDERED that:

1. Plaintiff The Homesteader's Store, Inc.'s motion for preliminary injunction, Dkt. 20, is GRANTED. Immediately upon plaintiff's posting of a bond, defendant Kubota Tractor Corporation will be ENJOINED from terminating its dealer agreement with plaintiff during the pendency of this case.

2. The parties may have until April 26, 2024, to submit briefs regarding the appropriate amount for an injunction bond.

Entered May 7, 2024.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge